LIVESTOCK SERVICES, INC. *v.* AMERICAN CYANAMID COMPANY

No. 42363 July 11, 1962 142 So. 2d 210

532

*Keady, Campbell and DeLong,* Greenville, for appellant.

*Wynn, Hafter, Lake & Tindall*, Greenville, for appellee.

LEE, P. J.

Livestock Services, Inc., a Mississippi Corporation, brought this suit in the Circuit Court of Washington County against American Cyanamid Company, a corporation, chartered, organized, and existing under the laws of the State of Maine. The plaintiff charged, in effect, that, in the Spring of 1961, it purchased a quantity of certain anthrax vaccine, manufactured and distributed by the defendant company and warranted by it to be fit and effectual as a remedy against anthrax; that the plaintiff injected the said vaccine into its cattle, in accordance with instructions issued by the defendant; that said vaccine was harmful and injurious to its cattle; and that it sustained substantial damage to its cattle as a result of the use of the same. Consequently, it demanded judgment against the defendant for the damage resulting from the alleged breach of warranty.

Process for the defendant was served on the Secretary of State.

The defendant, appearing specially and solely for the purpose of objecting to the jurisdiction of the court, in its motion to dismiss, set up in effect that it had not qualified to do business in this state, and that it was not so engaged when the suit was filed; that it neither had been found nor had it been served with process in Washington County; that it was not amenable to process in the courts of this state; and that the court had not acquired nor could it acquire jurisdiction over the defendant under any statute of this state.

John Morrison, Jr., who had been with the company sixteen years, working up from shipping clerk to branch manager, and who had been manager of the New Orleans branch of the company for four years, testified that the defendant had no office, warehouse, stock of goods, bank deposit, or executive officer in the State of Mississippi. Its only employees were ten salesmen, who were stationed in different parts of the state. No transaction by the defendant in Louisiana was ever closed in Mississippi. No salesman in this state had authority to receive or accept orders; but the same had to be forwarded to the proper branch of the company either in New Orleans or St. Louis. Remittances or payments were made in the same way. The salesmen for the division, known as Lederle, would call on doctors and point out the benefits of using the company's products, explaining what could and could not be expected. This promotional work was a part of the job of selling. Sometimes demonstrations were made. New products were introduced generally by leaflets sent through the mail or delivered by salesmen. Sometimes technical representatives would go to the experiment stations and also to Mississippi State University in order to bring out the fine points on which they were seeking tests. If a complaint was received, it would be passed on to the

proper one in authority. There was no final authority in Mississippi on any deal that the defendant might make. A map, referred to as the "Atlas", showed the location of all of the defendant's laboratories, plants, offices, warehouses, and sales offices, and none of these appeared to be in this state.

The plaintiff, in opposition to the motion to dismiss, offered, as a witness, Hugh Brannon, who had worked for the defendant a number of years. This man was connected with the agriculture division and was engaged in promoting and selling the company's products. He called on wholesalers, retailers, manufacturers, and formulators, trying to stimulate the sale of the defendant's products. He could make no sale personally. He could take an order orally or over the telephone, but he did not write it up. He had to take the matter up with the proper authority out of the state. If he received a complaint from a customer, he would get in touch with the Dallas office, and a technical man would visit the particular claimant. When the company has a new product, its representatives sometimes go to the experiment stations in an effort to get it tested. But these people make no sales. Sometimes demonstrations are conducted for the benefit of farmers; but no sale is ever closed in Mississippi. The salesman merely sells and promotes, sending the proposal to the proper office outside the state.

Harmon H. Barlow, an employee of Goyer Paint and Veterinary Drug Department, Greenville, Mississippi, testified that he placed with the New Orleans branch 95 per cent of his orders either by phoning or mailing. The balance he probably gave to Don Reagan, a field man of the company. The witness had a complaint from Mr. Graves, representing the plaintiff, and he reported it to the New Orleans office. In answer to that complaint, Dr. Cook, a veterinarian and employee of the

defendant, came from Dallas to see him, seeking a contact with Mr. Graves.

The evidence showed that the defendant qualified to do business in this state and appointed a resident agent for process on December 2, 1940; and that subsequently, on December 12, 1941, it filed its certificate that it had ceased the transaction of business in this state, and had withdrawn from operation in Mississisppi.

The evidence further showed that the defendant, acting under the provisions of House Bill 612, Laws of 1952, appointed Heber Ladner, Secretary of State, under date of August 12, 1952, as its lawful agent for process "in any action or legal proceeding in connection with and based upon the sale or shipment into Mississippi of products subject to the Mississippi Economic Poisons Act of 1950."

The motion to dismiss was sustained and Livestock Service, Inc., appealed to this Court.

The appellant says that appellee, at the time of the institution of this suit, was doing business in this state and was subject to suit here within the meaning of Sec. 1437, Code of 1942, Rec., so as to be deemed to have appointed the Secretary of State as its resident agent for process, and that it did not meet its burden of showing that it was not doing business in the state. Besides, it says that the appellee specifically appointed the Secretary of State as its agent for service of process for all purposes by an instrument executed and filed in accordance with the provisions of the Economic Poisons Act.

There are many decisions of this Court dealing with the expression "doing business". In one of the early cases, Saxony Mills v. Wagner, 94 Miss. 233, 47 So. 899, it was held that "in the case of a corporation which is not 'doing business' in this state, service of process upon a mere soliciting agent is not sufficient."

In Snipes v. Commercial & Industrial Bank, 225 Miss. 345, 83 So. 2d 179, the bank, as the holder of discounted paper on cars sold by the Snipes in their business at Batesville, Mississippi, sent some of its employees into the state to check the cars, to collect delinquent accounts, and to repossess motor vehicles and other appliances. Similar action was taken after the fire which destroyed the Batesville office. In some instances, these employees accepted payments on current accounts and issued receipts therefor. The case held that those acts were insufficient to constitute "doing business" on the part of the bank, a Tennessee corporation. The opinion cited, with approval, as a good statement of what "doing business" means 23 Am. Jur., Foreign Corporations, Sec. 361, p. 337, in part as follows: "as a general proposition upon which most of the authorities agree in principle, subject to such modifications as may be necessary in view of the particular issue or, of the terms of the statute involved, it is recognized that a foreign corporation is 'doing,' 'transacting,' 'engaging in,' or 'carrying on' business in the state when, and ordinarily only when, it has entered the state by its agents and is there engaged in carrying on and transacting through them *some substantial part of its ordinary or customary business,* usually continuous in the sense that it may be distinguished from merely casual, sporadic, or occasional transactions and isolated acts." (Emphasis supplied.) By way of documentation, the opinion cited a large number of the decisions of this Court on that question. Since the authorities were collated at that time, it is not necessary to list them again in this opinion. Cf. also 20 C. J. S., Corporations, Sec. 1829, p. 46.

In regard to occasional demonstrations to farmers and work at experiment stations in the colleges of the state, this constituted mere promotion to bring out the fine points of the product in aid of selling it. Cf.

Knower v. Baldwin, 195 Miss. 166, 15 So. 2d 47, where Knower carried along a stock of dummy watches and conducted solicitations in his own way. See also Refrigeration Discount Corporation v. Turley, 189 Miss. 880, 198 So. 731; Yellow Manufacturing Acceptance Corp. v. American Oil Co., 191 Miss. 757, 2 So. 2d 834; Reichman-Crosby Co. v. Stone, 204 Miss. 122, 37 So. 2d 22; J. R. Watkins Co. v. Flynt, 220 Miss. 871, 72 So. 2d 195.

The mere investigation of a complaint effects no added significance. In Watkins v. Flint, supra, the ''contact man came and investigated the solvency and suitableness of the sureties on his performance bond after procuring the witness to serve as a local dealer.''

 The appellee fully sustained the allegations of its motion and showed conclusively that it was not engaged in doing business in this state within the meaning of the decisions of this Court.

Did the appellee's appointment of the Secretary of State as its agent for service of process under the provisions of the Economic Poisons Act of 1950, and amendments thereto, Secs. 5000-01 and 5000-14, Code of 1942, Rec., bring it into the state for all purposes or simply for actions which might arise under that act?

The Mississippi Economic Poisons Act of 1950, Sec. 5000-01, et seq., Code of 1942, Rec., as its title provides, was an act ''relating to the distribution, sale, or transportation of adulterated or misbranded insecticides, fungicides, rodenticides, and other economic poisons; regulating traffic therein; providing for registration and examination of such materials, imposing penalties, and for other purposes.''

Subsection (a) of Sec. 2 thereof, Sec. 5000-02 of the Code, provides as follows: ''The term 'economic poison' means any substance or mixture of substances intended for preventing, destroying, repelling, or mitigating any insects, rodents, fungi, weeds, or other forms of plant

or animal life or viruses, *except viruses on or in living man or other animals."* (Emphasis supplied.)

Clearly vaccines do not fall in the category of "economic poisons".

Chapter 167, Laws of 1952, Sec. 5000-03 of the Code provides conditions, restrictions and limitations in connection with the distribution, sale and transportation of such poisons.

By Sec. 5000-06 of the Code, the State Plant Board is given free access to all places of business, factories, buildings, carriages, cars, stores, warehouses and other places where such poisons are offered or kept for sale or distribution.

By Subsection (a), Sec. 5000-14 of the Code, it is provided in part that: *"Any non-resident individual, partnership, association, firm, or corporation desiring to distribute, sell, or offer for sale within this state any product described in the Mississippi Economic Poisons Act of 1950,* being chapter 452 [Secs. 5000-01 et seq.], laws of 1950, and any such non-resident who may be subject otherwise to the provisions of such act, shall file a written power of attorney designating the secretary of state as the agent of such non-resident upon whom service of process may be had in the event of any suit against said non-resident individual, partnership, firm, association, or corporation; and such power of attorney shall be so prepared and in such form as to render effective the jurisdiction of the courts of Mississippi over such non-resident applicants and make such applicants amenable to the jurisdiction of the courts of this state." (Emphasis supplied.)

By Subsection (b) thereof it is provided in part that: "The state plant board *may also require such non-resident subject to the provisions of said act* to furnish to the board *a fidelity bond* or other security satisfactory to the board and *conditioned that the principal therein named shall pay for any and all damages suffered by*

*any person by reason of the negligence of the principal or his or its agents in the conduct of said business and shall honestly conduct said business* and as otherwise conditioned by said board, provided that in no case shall a bond or other security exceeding ten thousand dollars ($10,000.00) be required. \* \* \* *Any person having a right of action against such person, firm association or corporation may bring suit against the principal and sureties on such bond. \* \* \*''* (Emphasis supplied.)

██ █ It seems clear, from a consideration of the act as a whole, that it applies only to economic poisons as defined therein. The obvious intent of the legislature in requiring non-residents to qualify was to make them amenable to the process of the state courts in actions by the State Plant Board to enforce the provisions of the act and to provide as a citizen of this state redress for an injury against a manufacturer, distributor, or seller of such poisons arising out of the manufacture, distribution or sale of such poisons.

The alleged injury and damage, sought to be redressed in this proceeding, did not arise out of the manufacture, distribution or sale of economic poisons. It arose, if at all, from a breach of warranty in reference to vaccines against the disease of anthrax. Such materials are unquestionably excepted from the provisions of the economic poisons act.

In 23 Am. Jur., Foreign Corporations, Sec. 276, p. 250, it is said in part as follows: ''Even with respect to their interstate business, foreign corporations are subject to the control of the state *in the exercise of the police power,* and as to their property interests, to the taxing power, although the authority of the state in neither case extends so far as to justify their subjection either to requirements in this respect which are unreasonable or pass beyond the bounds of suitable local protection or to direct, as distinguished from remote or

incidental, burdens on such commerce.'' (Emphasis supplied.)

In Condon v. Snipes, 205 Miss. 306, 38 So. 2d 752, the appellant sued on appellee's alleged breach of his contract to eradicate termites. Appellee, although a resident of Memphis, Tennessee, for years, had been licensed to do his work under the provisions of Secs. 5006-11, inclusive, of the Code of 1942, Rec., and had continuously maintained an office in Hinds County, Mississippi, in charge of a salaried employee, who had authority to make contracts in the appellee's name with residents of Mississippi in connection with the eradication of termites and the service and control of the same. Because the regulatory statutes had been enacted to prevent fraudulent practices and as protection to the citizens of this state, and because they prohibited the rendition of such services unless a license therefor was first obtained from the State Plant Board, it was held that the appellee was subject to suit in this state, and that process, served on the Secretary of State, was sufficient to bring him into court. It was pointed out that there was a compliance with due process of the constitution inasmuch as residents and non-residents were placed in the same status. To guard against and obviate the danger of unconstitutionality, the court took particular pains to make the following statement. ''By being made to answer in the courts of this state *for the consequence of his business conducted in this state pursuant to the laws and regulations pertaining to that business,* he is placed in precisely the same category as residents of this state.'' (Emphasis supplied.)

In several areas of business, the legislature has invoked the police power of the state and enacted laws which require, as a condition precedent to engaging in such business, that a non-resident must appoint an agent, or will be deemed to have appointed the Secretary of State as his or its agent, for process in actions growing

out of its operation in such business. Some of these are the aircraft herbicide act, Chap. 169, Laws of 1952, Sec. 5000-21, et seq. of the Code; as to process upon unauthorized insurers on insurance policies, Sec. 5706, et seq. of the Code: The Milk Products Sales Act, Sec. 17, Chap. 156, Laws of 1960, Sec. 4560-117 of the Code.

By the operation of a motor vehicle upon the public streets or roads of this state, a non-resident is deemed to have appointed the Secretary of State as his agent upon whom process may be served in any action against him, growing out of any accident in which he may be involved while so operating such motor vehicle. Sec. 9352-61 of the Code. Suppose that a non-resident, while traveling in his automobile through this state, purchased a suit of clothes of the retail value of $100 from a Mississippi merchant on credit for thirty days and that he failed and refused to pay the debt when it became due. Obviously no one would be so brash as to contend, under the above section, that the non-resident could be brought into a state court by the service of process for him upon the Secretary of State and held to answer for such debt. The purchase of the suit had no connection whatever with the operation of the automobile over the public roads of the state.

For the reasons stated above, it is clear that the court had no jurisdiction in this cause and that it properly sustained the motion to dismiss.

Affirmed.

*Arrington, McElroy, Rodgers,* and *Jones, JJ.,* concur.